******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# THOMAS J. CROSSEN, JR., ET AL. *v.* HEIDI DIEHL ET AL. (AC 46951)

Elgo, Moll and DiPentima, Js.

*Syllabus*

The defendants H and M appealed from the trial court's judgment rendered for the plaintiffs, T and S, on all counts of their amended complaint brought as a result of a dispute between the parties, owners of neighboring lakefront properties, including an incident in which M spit on T. The defendants claimed, inter alia, that the court improperly considered the impact of the COVID-19 pandemic on T's claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and civil assault. *Held*:

The trial court's finding regarding the aggravating nature of the COVID-19 pandemic in support of its decision on the counts alleging intentional inflic-tion of emotional distress and negligent infliction of emotional distress was clearly erroneous, as there was no evidence in the record supporting the court's finding regarding the aggravating nature of the pandemic on T's emotional distress and, because of the potentially mixed perspectives regarding the risk of contracting COVID-19, the effect of M's spitting on T, by virtue of it occurring during the pandemic, was subject to reasonable dispute and could not be presumed but required testimony to support an emotional distress finding that was tethered to the pandemic.

The trial court's factual findings that M had threatened and spat on T in the count alleging civil assault were not clearly erroneous and were supported by the record, as, although the court referenced the fact that the spitting was made worse because it occurred during the COVID-19 pandemic, that finding was not integral to its conclusion that M had committed an offensive act and that T was put in imminent apprehension of offensive conduct.

The trial court's award of compensatory and punitive damages as to the counts of intentional infliction of emotional distress, negligent infliction of emotional distress and civil assault, an award that was fashioned to avoid double recovery in light of its compensatory damages award on the intentional infliction of emotional distress count, was vacated and the case was remanded with direction to recalculate the award of compensatory and punitive damages on the count of civil assault only, considering only evidence that was submitted at the original trial.

The trial court's determinations that the plaintiffs had established the bound-ary line between the neighboring properties in accordance with a certain survey submitted into evidence and that they had littoral rights privileges within their property line were not clearly erroneous, as the defendants offered no evidence to rebut the plaintiffs' evidence as to the littoral boundary.

The evidence was sufficient for the trial court to find for the plaintiffs on their trespass count, specifically for interference with the plaintiffs' littoral

rights, as the plaintiffs' exclusive ownership of the property was undisputed, the defendants had continuously intruded on the plaintiffs' property, the defendants' intrusions were done intentionally, and such instances of trespass caused injury and interfered with the plaintiffs' peaceful use and enjoyment of their property.

The trial court did not abuse its discretion in its award of damages on the plaintiffs' trespass claim, as, based on the claim litigated at trial, the court's findings that five years of continued trespass had transpired, the defendants and their guests had physically trespassed on the plaintiffs' property, and that the defendants' intrusions interfered with the plaintiffs' peaceful use and enjoyment of their property were not clearly erroneous.

(*One judge concurring in part and dissenting in part*)

Argued September 4, 2025—officially released August 4, 2026

*Procedural History*

Action to recover damages for, inter alia, trespass, and for other relief, brought to the Superior Court in the judicial district of Hartford, where Paul F. Diehl and Amy J. Diehl were cited in as party defendants; thereafter, the case was tried to the court, *Wilkerson Brillant, J.*; judgment for the plaintiffs, from which the defendants appealed to this court. *Reversed in part*; *judgment directed*; *award vacated*; *further proceedings*.

*Brandon B. Fontaine*, with whom was *Meaghan E. Collins*, for the appellants (defendants).

*Thomas A. Plotkin*, for the appellees (plaintiffs).

*Opinion*

MOLL, J. This appeal involves a dispute between the plaintiffs, Thomas J. Crossen, Jr. (Thomas), and Susan R. Crossen, and the defendants, Heidi Diehl and Michael Martin, who own neighboring properties on Lake Wangumbaug in Coventry.[1] The defendants appeal from the judgment of the trial court rendered in favor of the plaintiffs on all counts of their amended complaint, claiming that (1) the court improperly considered the

---

[1]Although Paul F. Diehl and Amy J. Diehl were cited in as defendants in this action, they did not appear at trial and have not participated in this appeal.

impact of the COVID-19 pandemic on Thomas' claims of intentional infliction of emotional distress (count three), negligent infliction of emotional distress (count four), and civil assault (count five), and (2) the plaintiffs provided insufficient evidence to support the court's findings regarding the counts of quiet title (count one) and trespass (count two). We affirm the judgment of the trial court rendered in the plaintiffs' favor on counts one and two. We reverse the portion of the trial court's judgment rendered in Thomas' favor on counts three and four in its entirety, vacate its award of damages on counts three, four and five, and remand this case with direction to recalculate the award of damages on count five only consistent with this opinion.

The following facts and procedural history are relevant to this appeal. On August 26, 2021, the plaintiffs filed the operative amended complaint in this action, seeking, in count one, a declaration quieting title to the boundary between the parties' properties and a determination of the littoral rights of the parties pursuant to General Statutes §§ 47-31[2] and 52-29.[3] In count two, the plaintiffs sought a temporary and permanent injunction prohibiting the defendants from encroaching on their property. In addition, Thomas asserted, against Martin only, a claim of intentional infliction of emotional distress (count three), a claim of negligent infliction of emotional distress (count four), and a claim of civil assault (count five). The plaintiffs sought compensatory damages against

[2] General Statutes § 47-31 (a) provides in relevant part: "An action may be brought by any person claiming title to . . . real . . . property . . . against any person who may claim to own the property, or any part of it, or to have any estate in it . . . or to have any interest in the property, or any lien or encumbrance on it, adverse to the plaintiff, or against any person in whom the land records disclose any interest, lien, claim or title conflicting with the plaintiff's claim, title or interest, for the purpose of determining such adverse estate, interest or claim, and to clear up all doubts and disputes and to quiet and settle the title to the property. . . ."

[3] General Statutes § 52-29 (a) provides: "The Superior Court in any action or proceeding may declare rights and other legal relations on request for such a declaration, whether or not further relief is or could be claimed. The declaration shall have the force of a final judgment."

the defendants as to counts one and two. Additionally, Thomas sought compensatory damages against Martin only as to counts three, four, and five and punitive damages against Martin only as to counts three and five.

In their answer, the defendants admitted that the plaintiffs are the owners of land located at 231 Standish Road in Coventry (plaintiffs' property), and the defendants are the owners of an abutting property located at Lot R00817 Standish Road in Coventry (defendants' property). Both properties have Lake Wangumbaug as a southerly boundary. The defendants stated that they lacked the requisite knowledge to admit or deny the allegations pertaining to quiet title and trespass and left the plaintiffs to their proof as to these counts. Martin denied the allegations of intentional infliction of emotional distress, negligent infliction of emotional distress, and civil assault. The court conducted a trial on March 22, 2023, and rendered its decision on July 3, 2023.

In its memorandum of decision, the court set forth the following relevant facts. "As neighbors, the plaintiffs and the defendants associated well with each other and were friendly until 2018 when the defendants began to use the plaintiffs' property without permission. Since that time, their relationship has deteriorated. The defendants have shouted obscenities at and acted aggressively towards the plaintiffs. The plaintiffs' property interest has been negatively impacted due to the ongoing hostilities. . . .

"Beginning in or around 2018, the defendants used the plaintiffs' property without permission in the following manners. The defendants placed a paddleboard rack, a dock, banners, cement block and stone pavers on the plaintiffs' property which crossed the property/boundary line and interfered with the plaintiffs' use of their property. Each year, the defendants placed fresh sand and stones to create a stone wall which 'crept' on the plaintiffs' property 'taking away a little more land.' . . . Martin destroyed the vegetation and soil on the plaintiffs' property. During the winter . . . Diehl cleared the

snow in front of the plaintiffs' waterfront for ice skating without the plaintiffs' permission.

"The defendants have acted hostile toward the plaintiffs and their guests and during the trial admitted to doing such. In June 2018 . . . Thomas . . . hired the first surveyor, Andrew Bushnell, to survey the plaintiffs' property to determine the boundary lines. While he was working . . . Diehl was 'heckling' Thomas . . . and the surveyor. . . . Martin then drove his vehicle onto the plaintiffs' property, narrowly avoiding Thomas . . . as he jumped out of the way of Martin's van. Bushnell shouted 'watch out' to alert Thomas . . . of Martin's vehicle. Martin then exited his vehicle and began to act belligerently, cursing and screaming at Thomas . . . . Shortly after this incident Bushnell ceased work on the property and informed Thomas . . . that he would not complete the survey. Thomas . . . then engaged Towne Engineering, Inc., to finish the survey in 2018.

"After the incident with Bushnell in 2018, Martin began to park his van in front of the plaintiffs' shed, despite the fact that there was a no trespassing sign clearly posted. The defendants also allowed their guests to park vehicles in areas which obstructed the plaintiffs' driveway. The defendants' guests would constantly park on the plaintiffs' 100 feet [of] frontage situated on Standish Road. The defendants would taunt Thomas . . . that he had nowhere to park his vehicle. Thomas . . . subsequently placed signs prohibiting parking on the plaintiffs' property. The defendants' guests then began parking across the street but would walk across the plaintiffs' property to get to the defendants' property. The defendants' guests took the paddleboards from the dock that was on the plaintiffs' property and would enter the water through the plaintiffs' waterfront.

"In August 2021, Thomas . . . hired a different surveyor, Joseph Boucher, to complete another survey.[4]

---

[4]The transcript reveals that Thomas hired Boucher in the spring of 2018. Boucher visited the property again in August 2021 at Thomas' request to locate the defendants' dock.

Boucher performed a land survey which revealed that the defendants' metal roofed paddleboard rack was on the plaintiffs' land. The defendants had also affixed banners to trees that were on the plaintiffs' property. The rack and banners encroached on the easterly side of the plaintiffs' property. The defendants' cement pavers/blocks were also encroaching onto the plaintiffs' property. Boucher's survey also revealed that the defendants' dock, a free-floating platform anchored below the lake surface, extended onto the plaintiffs' property on the easterly side. The defendants' dock had boats stored on top of it which encroached over the plaintiffs' property by 6.3 feet. The boundaries were marked, and the plaintiffs placed signage demarcating the property line, but the defendants still encroached on the plaintiffs' property. The defendants eventually removed the banners and paddleboard rack shortly before a court hearing. However, the dock still remains protruding on to the plaintiffs' property. . . .

"The defendants intimidated and antagonized the plaintiffs by placing numerous signs on the trees, chairs, and cement pavers/blocks facing the plaintiffs' property. These signs bore messages such as: 'Bully, leave us alone,' 'Bullies,' 'Please Leave us alone,' and 'Shame on You.' . . . The defendants antagonized the plaintiffs by starting arguments, making derogatory hand gestures, giving the plaintiffs the middle finger, and yelling profanities at the plaintiffs in front of the plaintiffs' grandchildren.

"On another occasion . . . Thomas . . . was attempting to leave in his vehicle while . . . Martin was sitting in his vehicle. Martin flashed his car lights at Thomas . . . left his vehicle, and approached [Thomas'] vehicle, while shouting obscenities and yelling. . . . Martin has yelled and cursed at Thomas . . . in front of other people, including the plaintiffs' ten year old granddaughter. When Thomas . . . is playing with his grandchildren, [Martin] has tried to instigate a fight with him by belittling [him], heckling him, and calling him derogatory names. Thomas . . . purchased a boat for use with his grandchildren and

when the grandchildren are getting the water items from the shed, the defendants have accosted the plaintiffs' grandchildren while the grandchildren were on the plaintiffs' property, telling them that their grandfather is only trying to buy their love and that they need to know who he is.

"During the COVID-19 pandemic, Martin saw Thomas . . . recording a video of the defendants' property and yelled at him to stay off his property. Thomas . . . was standing in the road, not on the defendants' property. Thomas . . . started recording Martin with his phone at which time Martin lost his temper, walked directly up to Thomas . . . within extremely close proximity (nose to nose) and spit on him twice while challenging him to a fight, cursing and yelling at him. . . .

"Thomas . . . has stress about the negative situation with the defendants and his property. Because he is worried that he cannot resolve these problems with the defendants, he does not sleep much or well, as he experiences frequent headaches and is constantly taking Advil medication." (Footnote added.)

Following trial, the court established the boundary and determined the littoral rights with respect to the plaintiffs' property, expressly crediting the survey map submitted into evidence by the plaintiffs. The court found the defendants liable for trespassing on the plaintiffs' property and ordered the defendants to remove all encroachments on the plaintiffs' property. The court further permanently enjoined the defendants from erecting similar structures that would encroach on the plaintiffs' land. Additionally, the court found that Martin was liable for intentional infliction of emotional distress and negligent infliction of emotional distress, concluding, as to the former, that Martin's act of spitting on Thomas during the COVID-19 pandemic was an extreme and outrageous act and, as to the latter, that Martin's act of spitting on Thomas during a global health pandemic created an unreasonable risk of emotional distress. Finally, the court found Martin liable for civil assault, relying,

in part, on Martin's act of spitting on Thomas during the COVID-19 pandemic.

The court awarded the plaintiffs $5000 in compensatory damages on the count alleging trespass. The court also awarded Thomas $50,000 in compensatory damages on his intentional infliction of emotional distress count and nominal damages of $1 on each of his negligent infliction of emotional distress and civil assault counts.[5] Lastly, the court awarded Thomas punitive damages in the form of attorney's fees, totaling $2028.75, for counts three and five, intentional infliction of emotional distress, and civil assault. Thereafter, the defendants filed a postjudgment motion for reconsideration and/or reargument. Following reconsideration, the court iterated its previous findings and declined to change its previous decision. The defendants then filed the present appeal.[6]

I

On appeal, the defendants first claim that the court improperly considered the impact of the COVID-19 pandemic on Thomas' claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and civil assault without Thomas having raised that issue or having presented sufficient evidence on it.[7] We agree with the defendants that the court erred

---

[5]The court awarded nominal damages on those counts to avoid double recovery in light of its award of compensatory damages on the intentional infliction of emotional distress count.

[6]As set forth in this opinion, the court found the defendants liable on the first two counts of the complaint. It also found Martin liable to Thomas on the third, fourth, and fifth counts and, accordingly, awarded Thomas compensatory and punitive damages on these counts. For convenience and consistency, we refer to "the plaintiffs" and "the defendants" in our analysis of the claims on appeal.

[7]The plaintiffs contend that the defendants' claim was not raised at trial and, therefore, was not preserved for appeal. We disagree. Because the court relied on COVID-19 in its memorandum of decision, we conclude that this issue is preserved for appellate review. See Practice Book § 60-5 ("court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial"); *Weiss* v. *Smulders*, 313 Conn. 227, 247–48, 96 A.3d 1175 (2014) ("even

in relying on factual findings relating to the pandemic to conclude that certain elements of Thomas' emotional distress claims had been proven. We further conclude that, although the court made a pandemic related finding in its analysis of Thomas' civil assault claim, such finding was not integral to its adjudication of that count. We, therefore, reverse the judgment of the trial court rendered in Thomas' favor on the emotional distress counts in its entirety and on the civil assault count only with respect to its award of damages and remand this case with direction to recalculate the award of damages on that count consistent with this opinion.

We first set forth the applicable standard of review. "[When] the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . In other words, to the extent that the trial court has made findings of fact, our review is limited to deciding whether those findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Downing* v. *Dragone*, 216 Conn. App. 306, 316, 285 A.3d 59 (2022), cert. denied, 346 Conn. 903, 287 A.3d 601 (2023).

A

We first consider whether the court's finding regarding the aggravating nature of the COVID-19 pandemic in support of its decision on the counts alleging intentional

though the defendants did not directly raise this claim at trial, they are permitted to pursue it on appeal because the trial court addressed this matter"); *Azia* v. *DiLascia*, 64 Conn. App. 540, 558–59 n.13, 780 A.2d 992 (addressing issue on appeal that arose for first time in court's memorandum of decision), cert. denied, 258 Conn. 914, 782 A.2d 1241 (2001).

infliction of emotional distress and negligent infliction of emotional distress was clearly erroneous.

The following additional facts are necessary for the resolution of this claim. In count three of the operative complaint, Thomas alleged a claim of intentional infliction of emotional distress against Martin. Specifically, Thomas alleged, inter alia, that Martin had spat on Thomas "while challenging him to a fight on two occasions during the summer of 2021 unmasked and during the COVID pandemic."[8] In count four of the operative complaint, Thomas alleged a claim of negligent infliction of emotional distress against Martin. This count incorporated by reference the allegations set forth in prior counts of the complaint, including the reference to the spitting incident alleged in the intentional infliction of emotional distress count.

In concluding that Thomas had proven his intentional infliction of emotional distress claim, the court found in relevant part that Martin's act of "spitting on Thomas . . . during the COVID-19 pandemic was an extreme and outrageous act . . . . The psychic toll of experiencing such abuse is compounded by the fact that it was done during the COVID-19 pandemic. Such an action would naturally create feelings of fear and anxiety regarding infection in addition to feelings of humiliation and anger." (Citation omitted; footnote omitted.) In addition, in concluding that Thomas had proven his negligent infliction of emotional distress claim, the court stated that, "[a]lthough the campaign of harassment undertaken by

---

[8]Paragraph 13 of the operative complaint states: "On numerous occasions . . . Martin has behaved in the following manner towards . . . Thomas . . . at or near the boundary of their properties set forth above:

"a. Shouting, screaming and yelling obscenities directed at Thomas . . . not only when he was alone but also when his immediate family was present;

"b. Confronting Thomas . . . and challenging him to fight with his chest right up to [Thomas'] chest on two occasions during the summer of 2021; and

"c. Spitting on Thomas . . . while challenging him to a fight on two occasions during the summer of 2021 unmasked during the COVID pandemic."

the defendants may not have risen to the level required to prove negligent infliction of emotional distress, spitting on Thomas . . . during a global health pandemic created an unreasonable risk of emotional distress."

The defendants contend that Thomas did not provide sufficient evidence regarding COVID-19 and its impact to support the court's findings regarding his claim of intentional infliction of emotional distress or his claim of negligent infliction of emotional distress. We agree.

In order to prevail on a claim of intentional infliction of emotional distress, a plaintiff must establish four elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." (Footnote omitted; internal quotation marks omitted.) *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 443, 815 A.2d 119 (2003). Thus, to establish a claim of intentional infliction of emotional distress, Thomas was required to prove, inter alia, that Martin's conduct was extreme and outrageous and that this conduct was the cause of Thomas' distress.

"To establish a claim of negligent infliction of emotional distress, a plaintiff must prove the following elements: (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." (Internal quotation marks omitted.) *Stohlts* v. *Gilkinson*, 87 Conn. App. 634, 645, 867 A.2d 860, cert. denied, 273 Conn. 930, 873 A.2d 1000 (2005). Thus, to establish a claim of negligent infliction of emotional distress, Thomas was required to prove, inter alia, that Martin's conduct created an unreasonable risk

of causing him distress and that Martin's conduct was the cause of his distress.

Contrary to the court's conclusion, however, our review of the record reveals no evidence to support the court's finding that the fact that the spitting incident occurred during the pandemic contributed to Thomas' emotional distress. The *only* evidence presented at trial regarding the pandemic was Thomas' chronological testimony that the spitting incident "was right at the tail end of [the pandemic] . . . ." Neither that testimony, nor any reasonable inferences drawn therefrom, establishes that Thomas' emotional distress was affected by the pandemic at all. The trial court merely speculated as to the impact of the pandemic on Thomas' mental state without "some basis of definite facts to enable the [trier of fact] reasonably to infer" such an impact. (Internal quotation marks omitted.) *Theodore* v. *Lifeline Systems Co.*, 173 Conn. App. 291, 320, 163 A.3d 654 (2017); see also *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, 250 Conn. 14, 34, 734 A.2d 85 (1999) ("[d]rawing logical deductions and making reasonable inferences from facts in evidence, whether that evidence be oral or circumstantial, is a recognized and proper procedure in determining the rights and obligations of litigants, but to be logical and reasonable they must rest upon some basis of definite facts, and any conclusion reached without such evidential basis is a mere surmise or guess" (internal quotation marks omitted)).

In its decision, the trial court compared the present case to *Prescott* v. *Gilshteyn*, Docket No. CV-22-5071036-S, 2023 WL 2582700 (Conn. Super. March 15, 2023), aff'd, 227 Conn. App. 553, 322 A.3d 1060, cert. denied, 350 Conn. 926, 326 A.3d 248 (2024). In *Prescott*, the plaintiff testified, and the trial court found credible, that "she experienced severe emotional distress as a result of being spat upon by [the defendant]. [The plaintiff] testified that she experienced severe emotional distress over increased concerns that she may contract COVID-19, emotional distress over concerns that COVID-19

might worsen her [multiple sclerosis], humiliation over being spat upon in public, and that the bodily violation of being spat upon reawakened the trauma of her past sexual assault." (Footnote omitted.) Id., *3. *Prescott* is distinguishable, however, because the plaintiff in that case presented extensive testimony regarding how the risk of contracting COVID-19, among other factors, exacerbated her emotional distress stemming from the defendant spitting on her during the pandemic. Id. In contrast, in the present case, Thomas presented *no* testimony that the pandemic contributed to his emotional distress.

Notwithstanding the absence of any relevant evidence regarding the COVID-19 pandemic, the plaintiffs contend that the trial court properly took judicial notice of the existence of the virus and its transmission through saliva. They further contend that it is a matter of ordinary common sense for the trial court to find that spitting on someone during the pandemic aggravated the inherent offensiveness of the act.[9] The plaintiffs cannot prevail on either of these contentions.

The plaintiffs rely on footnote 6 of the court's memorandum of decision in support of their contention that the court properly took judicial notice of the existence of the virus and its transmission through saliva. In footnote 6, the court quoted *Casey* v. *Lamont*, 338 Conn. 479, 482, 258 A.3d 647 (2021), for the proposition that "[COVID-19] is a respiratory disease caused by a virus that is transmitted easily from person to person and can result in serious illness or death. According to the Centers for Disease Control and Prevention . . . the virus

---

[9]The plaintiffs further contend that, because the complaint alleged that the spitting incident occurred during the pandemic; see footnote 8 of this opinion; the defendants were on notice that COVID-19 was an aggravating factor in the emotional distress counts. As to this contention, we note that the defendants denied this allegation in their answer to the operative complaint. Furthermore, it is a "well settled proposition that a plaintiff bears the burden of *proving* the allegations contained in the complaint." (Emphasis added.) *Rivera* v. *Meriden*, 72 Conn. App. 766, 769, 806 A.2d 585 (2002).

is primarily spread through respiratory droplets from infected individuals coughing, sneezing, or talking while in close proximity to other people." Although the plaintiffs are correct that the trial court quoted this passage, it is not clear that the court took judicial notice of the fact that the pandemic was in effect in the summer of 2021 and that the virus is transmitted by saliva. The plaintiffs did not request that the court take judicial notice of any facts and the court did not reference taking judicial notice in its opinion.

"A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) within the knowledge of people generally in the ordinary course of human experience, or (2) generally accepted as true and capable of ready and unquestionable demonstration." Conn. Code Evid. § 2.1 (c). "Our . . . cases have attempted to draw a line between matters susceptible of explanation or contradiction, of which notice should not be taken without giving the affected party an opportunity to be heard . . . and matters of established fact, the accuracy of which cannot be questioned, such as court files, which may be judicially noticed without affording a hearing." (Internal quotation marks omitted.) *Scalora* v. *Scalora*, 189 Conn. App. 703, 714, 209 A.3d 1 (2019). The plaintiffs contend that the fact that the pandemic was in effect in the summer of 2021 and the fact that the virus is transmitted by saliva fall within the category of " 'matters of established fact, the accuracy of which cannot be questioned . . . .' " See id. Even assuming that the plaintiffs are correct and the court took judicial notice of the existence of the pandemic in the summer of 2021 and its transmission by saliva, those facts do not establish that Thomas himself suffered increased emotional distress because the spitting incident occurred during the pandemic. In order for the court to find that Thomas' emotional distress was affected by the pandemic, Thomas was required to present evidence to that effect.

Finally, we disagree with the plaintiffs that, as a matter of ordinary common sense, spitting on someone

during the pandemic aggravated the inherent offensiveness of the act. "[Triers of fact] are not required to leave common sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observations and experience of the affairs of life, but, on the contrary, to apply them to the facts in hand . . . ." (Internal quotation marks omitted.) *Onyilogwu* v. *Onyilogwu*, 217 Conn. App. 647, 657, 289 A.3d 1214 (2023). "[F]acts [that] are of common knowledge, that is, facts so well known that evidence to prove them is unnecessary are proper subjects of judicial notice." (Internal quotation marks omitted.) *Commissioner of Transportation* v. *Bakery Place Ltd. Partnership*, 83 Conn. App. 343, 348, 849 A.2d 896 (2004); see also *State* v. *Tomanelli*, 153 Conn. 365, 368, 216 A.2d 625 (1966) ("proof by evidence concerning a proposition may be dispensed with where the court is justified, by general considerations, in declaring the truth of the proposition without requiring evidence from the party").

Our analysis is guided by this court's decision in *Autry* v. *Hosey*, 200 Conn. App. 795, 239 A.3d 381 (2020). In *Autry*, the plaintiff was struck by the defendant's police cruiser while crossing the street. Id., 796. The trial court awarded noneconomic damages to the plaintiff for emotional trauma that she suffered from being hit by the defendant's vehicle. Id. The defendants claimed on appeal that the trial court's calculation of such damages was improper because it "lacked the necessary evidence to find that pedestrians suffer greater emotional trauma when struck by a vehicle than occupants of a vehicle." Id. In awarding the plaintiff such damages, the trial court stated that, "[p]erhaps more importantly . . . the emotional trauma suffered by pedestrians struck by vehicles is generally greater than that suffered by persons involved in auto accidents as drivers or passengers . . . ." (Emphasis omitted; internal quotation marks omitted.) Id., 799.

This court agreed with the defendants' claim, reasoning that the trial court's factual statement comparing

pedestrians to drivers or passengers in auto accidents, which "explicitly provided an important basis for the court's award of $30,000 in noneconomic damages," was "not supported by any evidence presented to the [trial] court." Id. Further, this court disagreed with the plaintiff's assertion that the trial court's statement was a matter of common knowledge because "whether a pedestrian who is struck by a motor vehicle generally suffers greater emotional trauma than a driver or passenger of a vehicle that is struck, is something that would not be within the knowledge of people generally in the ordinary course of human experience and is subject to reasonable dispute." (Internal quotation marks omitted.) Id., 799–800. Ultimately, this court held that, because the plaintiff presented no evidence at trial supporting the trial court's factual finding and such finding was "not a matter of common knowledge," it was clearly erroneous. Id., 801.

Similarly, in the present case, whether the pandemic was *necessarily* an aggravating factor with respect to Thomas' emotional distress was not "within the knowledge of people generally in the ordinary course of human experience and is subject to reasonable dispute." (Internal quotation marks omitted.) Id., 800. Like the plaintiff in *Prescott* v. *Gilshteyn*, supra, 2023 WL 2582700, it is conceivable that some people would be affected mentally by the lingering presence of the pandemic and the potential risk of contracting COVID-19, thereby exacerbating their emotional distress. Conversely, it also is conceivable that other individuals would not share this sentiment and would not be as affected mentally such that it would sufficiently exacerbate their emotional distress in connection with an instance such as the spitting incident in the present case. Because of the potentially mixed perspectives regarding the risks of contracting COVID-19, the effect of a spitting incident on any plaintiff, by virtue of it occurring during the pandemic, is subject to reasonable dispute and would require testimony to support an emotional distress finding that is tethered to the pandemic. In sum, because there was no evidence

in the record supporting the court's finding regarding the aggravating nature of the pandemic on Thomas' emotional distress and because such a fact cannot necessarily be presumed, we conclude that the court's finding was clearly erroneous.

We now address whether the court's improper finding would warrant reversal of the judgment on Thomas' emotional distress claims. "[W]here . . . some of the facts found are clearly erroneous and others are supported by the evidence, we must examine the clearly erroneous findings to see whether they were harmless, not only in isolation, but also taken as a whole. . . . When the judgment of the trial court is based entirely on a clearly erroneous finding, and without that finding judgment would have entered for the other party, it is appropriate to reverse the judgment and remand the case with direction to render judgment for that party." (Citation omitted; internal quotation marks omitted.) *NRT New England, LLC* v. *Longo*, 207 Conn. App. 588, 600–601, 263 A.3d 870, cert. denied, 340 Conn. 906, 263 A.3d 821 (2021).

In its intentional infliction of emotional distress analysis, the court found that the fact that the spitting incident occurred during the pandemic "compounded" the "psychic toll" of the abuse that Thomas sustained and that "[s]uch an action would naturally create feelings of fear and anxiety regarding infection in addition to feelings of humiliation and anger." Further, in analyzing the first element of negligent infliction of emotional distress, the court relied solely on the impact of the pandemic on Thomas' emotional distress, stating that, "[a]lthough the campaign of harassment undertaken by the defendants *may not have risen to the level required to prove negligent infliction of emotional distress*, spitting on Thomas . . . during a global health pandemic created an unreasonable risk of emotional distress." (Emphasis added.) Because the court's improper factual findings related to the pandemic were integral to its adjudication of Thomas' emotional distress claims, we conclude that

the court's error was harmful, requiring reversal of its judgment on those counts and a remand with direction to render judgment for Martin on those counts. See *NRT New England, LLC* v. *Longo*, supra, 207 Conn. App. 601; see also *Shelton* v. *Statewide Grievance Committee*, 277 Conn. 99, 111, 890 A.2d 104 (2006) ("[i]t is well established that in administrative, civil and criminal cases, when the party charged with the burden of proof fails to satisfy that burden, it is not entitled to a second 'bite at the apple' on remand").

B

We next consider whether the court's factual finding regarding the aggravating nature of the COVID-19 pandemic in the count of civil assault was clearly erroneous.

"A civil assault is the intentional causing of imminent apprehension of harmful or offensive contact in another. 1 Restatement (Second), Torts [§ 21 (1965)]." *Maselli* v. *Regional School District No. 10*, Superior Court, judicial district of Hartford, Docket No. CV-15-6062402-S (June 11, 2018) (reprinted at 198 Conn. App. 648, 659–60, 235 A.3d 599), aff'd, 198 Conn. App. 643, 235 A.3d 599, cert. denied, 335 Conn. 947, 238 A.3d 19 (2020). According to § 21 of the Restatement (Second) of Torts, "(1) [a]n actor is subject to liability to another for assault if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension." 1 Restatement (Second), supra, § 21 (1).

In its memorandum of decision, the court found that Martin "intended to cause a harmful or offensive contact, or an imminent apprehension of such contact, with [Thomas]. Martin threatened [Thomas], approached him, and spat on him. Although threats and insults alone would be insufficient to sustain a claim of civil assault, Martin spitting on [Thomas] establishes the requisite elements. . . . In the present case, Martin purposefully spit on [Thomas]. . . . [S]pitting on a person is an offensive

act. The act was made worse due to the ongoing COVID-19 pandemic. Such an action would put a reasonable person in imminent apprehension of offensive contact. The court also finds that [Thomas] was put in such imminent apprehension." On the basis of our review of the record, we agree with the court that Thomas had established the elements necessary to prevail on a claim of civil assault. In particular, the court admitted into evidence a video that clearly showed Martin becoming aggressive toward Thomas and twice spitting on him.

The defendants contend, as they did with the counts alleging intentional infliction of emotional distress and negligent infliction of emotional distress, that the court's conclusion was based on its erroneous pandemic related factual findings. We disagree. Although the court referenced the fact that the spitting was made worse because it occurred during the COVID-19 pandemic, that finding was not integral to its conclusion that Martin had committed an offensive act and that Thomas was put in imminent apprehension of offensive conduct. Prior to referencing the pandemic, the court stated that, "[a]lthough threats and insults alone would be insufficient to sustain a claim of civil assault, Martin spitting on [Thomas] establishes the requisite elements." Contrary to the defendants' contention, the court's findings that Martin had threatened and spat on Thomas are supported by the record and are not clearly erroneous. The defendants, therefore, cannot prevail on this claim.

C

We next consider the court's award of compensatory and punitive damages to Thomas on the civil assault count in light of our reversal of the judgment in favor of Thomas on the counts of intentional infliction of emotional distress and negligent infliction of emotional distress.

As previously set forth in this opinion, the court awarded Thomas $50,000 in compensatory damages on his intentional infliction of emotional distress claim

and nominal damages of $1 on his negligent infliction of emotional distress and civil assault claims. The court indicated that it awarded nominal damages on the counts of negligent infliction of emotional distress and civil assault to avoid double recovery in light of its compensatory damages award on the intentional infliction of emotional distress count. Lastly, the court awarded Thomas punitive damages in the form of attorney's fees, totaling $2028.75, for counts three and five, i.e., intentional infliction of emotional distress and civil assault.

The court's award of compensatory and punitive damages on the civil assault count, therefore, was tethered to its award of compensatory and punitive damages on the intentional infliction of emotional distress count. Having concluded in part I A of this opinion that the court's reliance on clearly erroneous findings of fact regarding the pandemic requires reversal on the count of intentional infliction of emotional distress, this case must be remanded with direction to recalculate the award of compensatory and punitive damages on the count of civil assault, considering only evidence that was submitted at the original trial. See *Palkimas* v. *Quilli*, 238 Conn. App. 586, 605,   A.3d   (2026).[10]

## II

The defendants next claim that the court's factual findings regarding the counts of quiet title and trespass were clearly erroneous. Specifically, the defendants contend that the plaintiffs failed to present any evidence

---

[10]We note the defendants' contention that the court lacked an evidentiary basis to award punitive damages on either the intentional infliction of emotional distress count or the civil assault count. Specifically, the defendants contend that the fee schedule and affidavit of the plaintiffs' counsel were never admitted as full exhibits at trial. As to this contention, we note that, during closing argument, counsel for the plaintiffs requested punitive damages and provided an affidavit of attorney's fees and costs to the court. When asked if he had shared the affidavit with the defendants, counsel responded, "Yes, they have it." The defendants did not contradict counsel's representation. On remand, the record should clearly reflect whether the affidavit of attorney's fees and itemized bill reflecting the fees were admitted into evidence as full exhibits.

of a littoral boundary area upon which the defendants could have trespassed. They also contend that, even if the evidence established a littoral boundary, the plaintiffs presented no evidence demonstrating that they interfered with the plaintiffs' littoral rights within the littoral area. Finally, the defendants claim that, even if the court properly decided that they had trespassed, the court improperly calculated the plaintiffs' damages award. We consider each of these claims separately.

## A

The defendants contend that the plaintiffs failed to introduce sufficient evidence of littoral boundaries. We disagree.

The following additional facts are necessary for the resolution of this claim. In count one of the operative complaint, the plaintiffs alleged that the location of the easterly boundary of the plaintiffs' property and the westerly boundary of the defendants' property was in dispute. The plaintiffs attached to their complaint, as exhibit C, a boundary map dated September 7, 2018, prepared by Towne Engineering, Inc., an engineering and surveying firm, which they alleged set forth the easterly boundary of the plaintiffs' property and the westerly boundary of the defendants' property. The deed to the plaintiffs' property described the southerly boundary as "by Lake Wangumbaug, one hundred (100) feet, more or less," and the deed to the defendants' property described the southerly boundary as "by Lake Wangumbaug, fifty feet, more or less . . . ." The plaintiffs' complaint further alleged that they also had littoral rights extending from the edge of Lake Wangumbaug waterward along the boundary line set forth in exhibit C until navigable waters.

At trial, the court admitted into evidence, as full exhibits: a survey prepared by Boucher, a surveyor with Towne Engineering, Inc., dated October 19, 2021, delineating the boundaries of the plaintiffs' property; the deed to the plaintiffs' property; the deed to the defendants'

property; and several photographs of the boundary line area. Boucher testified as to the methodology of surveying, the survey's accuracy, and the plaintiffs' land boundaries and littoral rights. The defendants offered no evidence to rebut the plaintiffs' evidence.[11] In its decision, the court held that the property line as put forward by the plaintiffs' exhibit C and testified to by Boucher was the correct boundary. Additionally, the court concluded that the plaintiffs had exclusive littoral rights and privileges within their property line.

On appeal, the defendants first contend that the court improperly relied on exhibit C to establish the boundary line. According to the defendants, although exhibit C was attached to the plaintiffs' complaint, it was not admitted into evidence at trial. The defendants' claim, however, is not supported by the record. It is true that the plaintiffs attached to their complaint, as exhibit C, a boundary map dated September 7, 2018, prepared by Towne Engineering, Inc. Plaintiffs' exhibit 15, admitted into evidence at trial, was a revision of the 2018 map prepared by Towne Engineering, Inc. The revised survey map is dated October 19, 2021. Boucher testified that the boundary line in the 2021 survey had not changed since the original survey in 2018. Notably, the court later admitted the September 7, 2018 survey into evidence as a full exhibit at the defendants' request. Because the survey map dated September 7, 2018, was properly admitted into evidence at the defendants' request, the defendants cannot prevail on their claim that the court's consideration of that survey was improper.

The defendants next contend that, even if the court used the correct map, neither the September 7, 2018 survey nor the revised survey dated October 19, 2021, contains any littoral rights analysis. We disagree and conclude that the evidence was sufficient for the court to establish the plaintiffs' littoral boundary rights.

[11]Rather, the defendants offered to "give" the plaintiffs the disputed portions of the property.

"Littoral rights are the rights that shoreline owners possess to make exclusive use of the land lying seaward of the mean high water mark. . . . [O]wners of . . . upland [appurtenant to bodies of water] have the exclusive, yet qualified, right and privilege to . . . wharf out from the owner's land in a manner that does not interfere with free navigation." (Internal quotation marks omitted.) *Cohen* v. *Dept. of Energy & Environmental Protection*, 215 Conn. App. 767, 833, 285 A.3d 760, cert. denied, 345 Conn. 968, 285 A.3d 1126 (2022), and cert. denied, 345 Conn. 969, 285 A.3d 737 (2022). "[W]hen a deed generally describes the abutting property as bounded by the body of water, title to the bed is based on littoral ownership, and each littoral owner impliedly owns the land under the water to the center of the body and each abutting owner is entitled to common use of the entire body." *Ace Equipment Sales, Inc.* v. *Buccino*, 273 Conn. 217, 227 n.8, 869 A.2d 626 (2005).

The deed to the plaintiffs' property described the southerly boundary as "by Lake Wangumbaug, one hundred (100) feet, more or less . . . ." At trial, Boucher testified regarding photos of the staked boundary line between the properties with a hand drawn line extending into the lake to establish the littoral boundary. When asked if the photos accurately represented the boundary line if it extended out into the water, Boucher responded that "it is as close as you're going to get in a photo . . . ." He described littoral rights as "the rights of a property owner, adjacent to a water body, to that water body." The survey map dated September 7, 2018, states: "Littoral rights to a portion of the submerged area likely exist but have not been fully explored for the preparation of this survey." Plaintiffs' exhibit 15, the revised survey map dated October 19, 2021, however, states: "Littoral rights to Coventry Lake exist in favor of [the plaintiffs] following extension of easterly and westerly property lines including the unrestricted access from the property to the lake including the unrestricted right to install docks and

wharves along the lake frontage."[12] Plaintiff's exhibit 15 describes the lake as "Coventry Lake aka Lake Wangumbaug." The defendants offered no evidence to rebut the plaintiffs' evidence as to the littoral boundary.[13] On the basis of this evidence, we cannot say that the court's determinations that the plaintiffs had established the boundary line in accordance with plaintiffs' exhibit C and that they had littoral rights privileges within their property line were clearly erroneous.[14]

### B

Even if the court properly established the littoral boundary, the defendants contend that the plaintiffs

[12]We note that the copy of exhibit 15 reproduced in the appendix to the defendants' brief is an unsigned version of the survey map that does not contain the surveyor's license number and certification. This version of exhibit 15 states that "[l]ittoral rights to a portion of the submerged area likely exist but have not been fully explored for preparation of this survey."

The exhibit admitted into evidence at trial contains Boucher's original signature and license number and is stamped with the surveyor's certification as an original. This version of the survey provides that "[l]ittoral rights exist in favor of [the plaintiffs] following extension of easterly and westerly property lines including the unrestricted access from the property to the lake including the unrestricted right to install docks and wharves along the lake frontage."

[13]As noted in the court's memorandum of decision, the defendants attempted to submit what they claimed was a "proposed" or "preliminary" survey, but the court declined to admit the survey into evidence in the absence of any corroborating testimony by the author of the survey.

[14]We note that, as part of this claim on appeal, the defendants contend that the methodology employed by the court to establish the littoral boundaries is inconsistent with *Rochester* v. *Barney*, 117 Conn. 462, 169 A. 45 (1933). The defendants cite *Rocheste*r for the proposition that, "[w]here the general course of the shore is a straight line, the division of riparian rights between adjoining landowners is along a perpendicular to the straight line from the intersection of the upland boundary line between the parties with the high-water mark." Id., 469–70. The defendants contend that the plaintiffs introduced no evidence regarding the shape of the parties' shorelines, or any testimony that the littoral boundary was determined using the shape of the parties' shoreline. At trial, the defendants did not present any evidence to rebut the littoral boundary line set forth in the plaintiffs' survey map, nor did they argue that the court should follow the methodology set forth in *Rochester* v. *Barney*, supra, 469–70, to establish the littoral boundary line. "Our

failed to present evidence of interference with littoral rights. We disagree.

"The essentials of an action for trespass are: **(1)** ownership or possessory interest in land by the plaintiff; **(2)** invasion, intrusion or entry by the defendant affecting the plaintiff's exclusive possessory interest; **(3)** done intentionally; and **(4)** causing direct injury. . . . Additionally, an action for trespass may be maintained, in appropriate circumstances, to protect against the encroachment on littoral rights." **(**Citation omitted; internal quotation marks omitted.**)** *Murphy* v. *EAPWJP, LLC*, 123 Conn. App. 316, 330, 1 A.3d 1171 (2010), appeal dismissed, 306 Conn. 391, 50 A.3d 316 (2012).

The plaintiffs' evidence establishing their ownership or possessory interest in the land included Boucher's testimony as to the boundaries of the plaintiffs' property and their littoral rights; the plaintiffs' deed; the defendants' deed; and the plaintiffs' survey map. The plaintiffs' evidence establishing an invasion, intrusion, or entry by the defendants included Boucher's testimony that, as of August 20, 2021, the defendants' dock extended 6.3 feet over the shared boundary line. Thomas testified that the defendants "had boats and stuff on top of that dock that extend even further" and that the defendants and their guests "will take paddleboards, canoes, you name it, and take it off of that dock that is already in front of my property, and go out in the water in front of my property, which interferes or makes it so that I can't use my waterfront." The photographs admitted into evidence showed various encroachments made by the defendants into the plaintiffs' littoral area. Finally, the survey map

appellate courts, as a general practice, will not review claims made for the first time on appeal. We repeatedly have held that [a] party cannot present a case to the trial court on one theory and then seek appellate relief on a different one . . . . [A]n appellate court is under no obligation to consider a claim that is not distinctly raised at the trial level. . . . [B]ecause our review is limited to matters in the record, we [also] will not address issues not decided by the trial court." **(**Citation omitted; internal quotation marks omitted.**)** *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 619–20, 99 A.3d 1079 (2014).

admitted into evidence reflected encroachments made by the defendants onto the plaintiffs' property, including the dock encroaching on their littoral area.

On the basis of the record before it, the court found that the plaintiffs' exclusive ownership of the property was undisputed. The court also concluded that the defendants have "continuously intrud[ed] on the plaintiffs' property by constructing a dock . . . ." The court found, and the defendants do not contest, that the defendants' intrusions were done intentionally. Lastly, the court found that such instances of trespass caused injury and interfered with the plaintiffs' peaceful use and enjoyment of their property. We cannot conclude that the court's findings were clearly erroneous. As such, on the basis of our review of the record, we conclude that there was sufficient evidence for the court to find in favor of the plaintiffs on the trespass count, specifically, for interference with the plaintiffs' littoral rights.

C

Finally, the defendants contend that, even if the court properly found the defendants liable for trespass, it improperly calculated the damages award. We disagree.

We first set forth our standard of review. "Normally, we review a court's determination of damages under an abuse of discretion standard. . . . When, however, a damages award is challenged on the basis of a question of law, our review [of that question] is plenary." (Internal quotation marks omitted.) *Robert* v. *Scarlata*, 96 Conn. App. 19, 22, 899 A.2d 666 (2006).

The following additional facts are necessary for the resolution of this claim. In its decision, the court noted that the plaintiffs were seeking, inter alia, compensatory damages for the diminution of their property value resulting from the defendants' trespasses. Because the plaintiffs had failed to submit evidence to support such an award, the court awarded "zero dollars ($0) for the diminution in value." The court did, however, award compensatory damages of $5000 to the plaintiffs due

to the defendants' interference with the plaintiffs' use and enjoyment of their land and littoral rights. The court indicated that this award was based on its calculation of $1000 per year for five years. The defendants claim that the evidence was insufficient to support this award.

"Whenever *a harm to land* occurs from an invasion of property rights, the measures of damage to be considered are the difference in the value of the land before and after the harm, the loss of the use of the land, and the discomfort and annoyance to the party harmed as an occupant." (Emphasis in original; internal quotation marks omitted.) *Robert* v. *Scarlata*, supra, 96 Conn. App. 23.

The defendants cite *Boyne* v. *Glastonbury*, 110 Conn. App. 591, 955 A.2d 645, cert. denied, 289 Conn. 947, 959 A.2d 1011 (2008), for the proposition that damages for interference with use and enjoyment can only be recovered under a nuisance claim and the plaintiffs did not allege a nuisance claim.[15] This court stated in *Boyne* that "recent case law treats trespass cases as involving acts that interfere with a plaintiff's exclusive possession of real property and nuisance cases as involving acts interfering with a plaintiff's use and enjoyment of real property." Id., 599–600. We disagree with the defendants that this language compels the conclusion that loss of use and enjoyment is an improper measure of damages in an action for trespass. In this regard, this court further stated in *Boyne* that "claims of nuisance may include an instance of trespass in that a physical entry onto land possessed exclusively by another also may affect, in the abstract, the possessor's use and enjoyment of the land. . . . The two actions, trespass and private nuisance, are thus not entirely exclusive or inconsistent,

---

[15]The defendants further assert that the plaintiffs never requested damages for loss of the use and enjoyment of the property but, rather, sought only compensatory damages for the diminished value of the property. We disagree. Although the court's decision states that the plaintiffs were seeking "compensatory damages for the diminution of their property value due to these trespasses," the plaintiffs' complaint more broadly sought compensatory damages against the defendants on the count of trespass.

and in a proper case in which the elements of both actions are fully present, the plaintiff may have his choice of one or the other, or may proceed upon both." (Citations omitted; internal quotation marks omitted.) Id., 600. The defendants' reliance on *Boyne* in support of their claim that the court improperly calculated the damages award, therefore, is misplaced.

The defendants further contend that, even if damages are allowed based on loss of use and enjoyment, the court erred by including facts in its decision that were beyond the scope of the plaintiffs' complaint. Specifically, although the complaint alleged that the defendants had trespassed on their property in certain respects beginning in the summer of 2021, the court awarded damages for incidents that occurred in 2018 or 2019.

"[O]rdinarily a court may not grant relief on the basis of an unpleaded claim. . . . That does not necessarily mean, however, that the absence of a particular claim from the pleadings automatically precludes a trial court from addressing the claim, because a court may, despite pleading deficiencies, decide a case on the basis on which it was actually litigated and may, in such an instance, permit the amendment of a complaint, even after the trial, to conform to that actuality. . . . Indeed, [our Supreme Court has] recognized that, even in the absence of such an amendment, where the trial court had in fact addressed a technically unpleaded claim that was actually litigated by the parties, it was improper for [this court] to reverse the trial court's judgment for lack of such an amendment." (Citations omitted.) *Stafford Higgins Industries, Inc.* v. *Norwalk*, 245 Conn. 551, 575, 715 A.2d 46 (1998). "[V]ariations between facts or issues alleged in a complaint and facts or issues raised at trial do not necessarily preclude a court from basing its decision on facts or issues actually litigated at trial." *Maloney* v. *PCRE, LLC*, 68 Conn. App. 727, 747, 793 A.2d 1118 (2002).

On the basis of the claim litigated at trial, the court found that five years of continued trespass had transpired, which included encroachments by the defendants

in the form of a paddleboard rack, cement blocks, vehicles, signs and banners, a dock, moorings, and the destruction of vegetation and soil.[16] Additionally, the court found that the defendants and their guests had physically trespassed on the plaintiffs' property and that the defendants' intrusions on the plaintiffs' property interfered with the plaintiffs' peaceful use and enjoyment of their property. The court's findings in this regard are supported in the record and are not clearly erroneous. The court, therefore, did not abuse its discretion in its award of damages on the plaintiffs' claim of trespass.

The judgment is reversed only as to counts three and four of the plaintiffs' amended complaint and the award of compensatory and punitive damages on counts three, four and five of the plaintiffs' amended complaint is vacated and the case is remanded with direction to render judgment for Martin on counts three and four and for further proceedings to recalculate the award of damages on count five; the judgment is affirmed in all other respects.

In this opinion *DiPENTIMA, J.*, concurred.

---

[16]The court acknowledged that the paddleboard rack and the banners had been removed.